**Janis COX, Plaintiff,**

v.

**ELECTRONIC DATA SYSTEMS CORPORATION, a Texas corporation, Defendant.**

**No. 89–CV–73557–DT.**

United States District Court, E.D. Michigan, S.D.

Nov. 13, 1990.

Donald J. Gasiorek, Southfield, Mich., for plaintiff.

Martin T. Wymer, Southfield, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

Plaintiff, Janis Cox, a former employee of Defendant Electronic Data Systems Corporation ("EDS" or the "company"), instituted this wrongful discharge action against her former employer in Wayne County Circuit Court on November 6, 1989. EDS timely removed the action to this Court on December 7, 1989 on diversity of citizenship grounds.

In her three-count Complaint, Ms. Cox alleged (1) that she had a "just cause" employment contract with EDS and that EDS breached that contract when it terminated her employment on May 17, 1989 (Count I); (2) that EDS discriminated against her because she is black, in violation of the Michigan Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101, *et seq.* (Count II); and (3) that EDS discharged her in retaliation for having filed a complaint of race discrimination with the Michigan Department of Civil Rights, also in violation of the Elliott–Larsen Act (Count III).

Following the close of discovery, on June 12, 1990, Defendant moved for summary judgment, pursuant to Fed.R.Civ.Pro. 56, contending (1) that there is no genuine issue of material fact that Plaintiff did not have a just cause employment contract with EDS, and (2) that Plaintiff has failed to establish a *prima facie* case of race discrimination. EDS, therefore, contends that it is entitled to summary judgment in its favor and that Plaintiff's Complaint should, accordingly, be dismissed in its entirety.

Plaintiff filed a Response opposing Defendant's Motion for Summary Judgment on June 28, 1990, to which Response Defendant replied by filing a Reply Brief on July 3, 1990.

Having reviewed the parties' respective briefs and the exhibits attached thereto, and having heard the oral arguments of the parties' attorneys on November 8, 1990, the Court is now prepared to rule on Defendant's Motion, and this Memorandum Opinion and Order sets forth that ruling.

## I. FACTUAL BACKGROUND

Plaintiff Janis Cox, a black female, is a former employee of Defendant EDS who began working for the company in Atlanta, Georgia on January 2, 1986. From that date, until the termination of her employment in May of 1989, Ms. Cox worked at several EDS sites around the country including Atlanta, Georgia; Janesville, Wisconsin; and Troy, Michigan in various positions involving computer information processing. Her last position was that of a "Systems Engineer" in the Troy, Michigan EDS facility, a position she held from sometime in late December 1988 or early January 1989, until her discharge from EDS some five months later.

Although Plaintiff's on-the-job performance through the summer of 1988 had been satisfactory, beginning in early 1989, Ms. Cox began demonstrating what EDS determined were "serious performance problems"—not finishing work by scheduled deadlines (even after the deadlines were repeatedly pushed back to accommodate her), not completing assignments that ended up having to be finished by other systems engineers; and failing to take her turn for "on call" duty.[1] By March of 1989, Plaintiff's performance problems had become so pronounced that customers began experiencing problems and EDS per-

---

1. At her deposition in this case, taken on April 10, 1990, Plaintiff disputed EDS's complaints about her job performance. She contends that some of the performance deficiencies pointed out by her employer are simply "untrue"; other deficiencies she admits are true, but she contends that they can be explained or justified because she was relatively new to the Troy, Michigan job and did not know what her specific duties were.

sonnel began complaining about her. Thus, on March 20, 1989, her immediate superior, Diane Haas, informed Plaintiff that she was going to be put on a Performance Improvement Plan ("PIP"), a structured work plan setting forth particular tasks for the employee to perform, geared at improving performance. When she was informed that she was being put on a PIP, Plaintiff, reacted angrily and left work (apparently without permission) for the rest of the day. Ms. Cox's reaction to the PIP had been so negative that the next day, Ms. Haas, Haas' supervisor, Michael VanDyke, and Curvie Burton, who is apparently above both Haas and VanDyke in the EDS supervisory chain-of-command (and who, like Plaintiff, is black), met with Plaintiff to discuss her job performance and her negative reaction to the PIP. Following that meeting, Burton revoked Plaintiff's PIP. Burton, however, advised Plaintiff that she was expected to maintain an adequate level of performance.

On March 23, 1990, Ms. Haas gave Plaintiff a "Review of Goals and Objectives", outlining performance improvements that Ms. Cox needed to work on. Shortly thereafter, on March 27, 1990, Plaintiff filed a charge of race discrimination with the Michigan Department of Civil Rights.[2]

Then, on April 13, 1989, Plaintiff met with Diane Haas for a formal performance appraisal. At this appraisal meeting, Ms. Haas discussed Plaintiff's performance, including her deficiencies, with specificity. Haas evaluated Plaintiff's performance as "marginal", the lowest performance rating, and advised Ms. Cox as to what improvements she needed to make in connection with her work.

Plaintiff's performance, however, did not improve. During the first two weeks of May, 1989, Plaintiff made five separate on-the-job mistakes which EDS characterized as "critical". Haas brought the errors to Michael VanDyke's attention. VanDyke, in turn, discussed the matter with Curvie Burton, and Burton and VanDyke jointly made the decision to terminate Plaintiff's employment with EDS.

Six months after the termination of her employment, Plaintiff instituted this lawsuit alleging breach of contract, race discrimination and retaliatory discharge.

## II. DEFENDANT'S ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT AND PLAINTIFF'S COUNTER–ARGUMENTS

### A. *Plaintiff's Breach of Contract Claim.*

In its motion for summary judgment and brief in support thereof, Defendant contends that Plaintiff was an "at-will" employee as a matter of law by virtue of her having signed an "Employee Agreement" prior to starting on the job at EDS in January 1986 which contained a provision which stipulated that she was an at-will employee whose employment could be terminated by EDS at any time with or without cause, and that any modification of her employment relationship with EDS could only be effectuated if it were done in writing and signed by an officer of EDS. Since Plaintiff admitted in her deposition that (1) no EDS supervisor ever verbally promised or assured her that she would only be fired for cause, and (2) other than the original Employee Agreement which she signed prior to starting at EDS, no other written agreements were ever entered into between the parties, by virtue of the at-will disclaimer in her original Employee Agreement, EDS argues that as a matter of law, Count I of Plaintiff's Complaint cannot withstand summary judgment.

Plaintiff counters that (1) an employee manual she was given when she started to work at EDS which provided for a performance appraisal system, (2) a guide provided to EDS managers (Plaintiff was not a manager) entitled "Managing People" which states that EDS has two basic reasons for releasing an employee—failure to perform the duties of the job and violation of company policy or terms of the Employee

---

**2.** The charge of discrimination was predicated on Plaintiff allegedly having requested at some point in time between January and April 1989, but not having been granted, a transfer to another EDS facility.

Agreement, and (3) the February 7, 1990 deposition testimony of Michael VanDyke that his own understanding of how EDS operates, based on "common sense", was that "you don't separate anyone without a reason" override the at-will disclaimer in her Employee Agreement and, thus, create a jury-submissible issue on her breach of contract claim.

B. *Plaintiff's Claims of Race Discrimination.*

Plaintiff contends that EDS discriminated against her because of her race in (1) refusing her January or February 1989 request for a transfer to another EDS facility and (2) in terminating her employment in May of 1989. Defendant contends that it is entitled to summary judgment on the race discrimination claims because Plaintiff cannot establish that any "similarly situated" white employees were treated differently than she was, nor has she established any evidence of discriminatory predisposition on the part of her supervisors. Thus, Defendant argues that Plaintiff has failed to establish a *prima facie* case of discrimination under either a "disparate treatment" or "intentional discrimination" theory. Plaintiff disputes Defendant's contentions of insufficiency of evidence of discrimination.

C. *Plaintiff's Retaliation Claim.*

As to Plaintiff's claim of having been discharged for filing a charge of race discrimination with the Michigan Department of Civil Rights two months earlier, Defendant contends that Plaintiff has failed to show that the filing of her complaint with the Department of Civil Rights was a significant factor in EDS' treatment of her.

Although Plaintiff concedes that the mere fact that her discharge occurred after she filed her claim of discrimination does not establish a claim of retaliation, Plaintiff contends that a jury-submissible issue has been created on this count because she claims that EDS *knew* of Plaintiff's filing of the charge before she was fired.

III. ANALYSIS

A. *The Standards Governing Consideration of a Motion For Summary Judgment*

The standards governing a trial court's consideration of motions for summary judgment were redefined by the United States Supreme Court in a 1986 trilogy of cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), the Supreme Court held:

The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict. . . .

In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1350, 1356, 89 L.Ed.2d 538 (1986), the Court held that if a plaintiff's claim is, in the judge's view, "implausible" and "makes no . . . sense," in order to defeat summary judgment a plaintiff "must come forward with more persuasive evidence to support [his] claim than would otherwise be necessary."

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the Court held that summary judgment must be granted where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case.

The Sixth Circuit expressly adopted this "new era" in summary judgment practice in its recent decision in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), and delineated in that case the principles

extracted from the 1986 Supreme Court trilogy and their progeny that are to guide trial courts in this circuit in deciding motions for summary judgment:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter or law."

6. As on federal directed verdict motions, the "scintilla rule" applies. i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion that in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

886 F.2d at 1478–1480 [footnotes omitted].

The Court will decide the summary judgment motion before it by application of the foregoing principles.

B. *Plaintiff's Breach of Contract Claim*

1. *Pertinent Facts Regarding the Breach of Contract Claim*

Approximately a month before beginning on the job at EDS in January 1986, Plaintiff attended a new employee orientation meeting. At that orientation meeting, on December 5, 1985, Plaintiff was presented with and signed an "Employee Agreement". The Agreement set forth Plaintiff's salary and starting date of work, included provisions governing confidentiality, noncompetition and relinquishment of rights as to inventions, and further provided as follows:

It is the desire and expectation of each party that the employment relationship shall be a pleasant and rewarding experience for the parties hereto. *However, it is understood that the employment relationship may be terminated at will, with or without cause, by either party at any time* provided, however, that all obligations of the Employee contained herein in Paragraphs 3, 4 and 5 of this Agreement shall survive.[3] *It is further agreed that this Agreement may be modified or amended only by a written*

---

**3.** Paragraphs 3, 4 and 5, respectively, set forth the above-mentioned confidentiality/non-disclosure terms, covenant not to compete, and relinquishment of rights to any inventions developed by the employee during the course of employment with EDS.

*instrument executed by EDS and Employee, and approved in writing by an Officer of EDS.*

[Employee Agreement para. 7. (Footnote and emphasis added.)]

The Employee Agreement that Plaintiff signed on December 5, 1985 was also signed by EDS President H. Ross Perot and Gary House, the EDS manager who interviewed and ultimately hired Plaintiff. Plaintiff testified in her deposition that she never signed any other contract with any EDS manager or officer.

### 2. *Choice of Law for Resolution of the Breach of Contract Claim*

■ Although neither Plaintiff nor Defendant addressed the issue of "choice of law" in their briefs supporting/opposing summary judgment, the Court views this matter as a threshold issue in the determination of Plaintiff's breach of contract claim for the following reason:

Paragraph 8 of the above-referenced Employee Agreement signed This Agreement shall be governed and construed by *the laws of the State of Texas....*

[Employee Agreement para. 8. (Emphasis added.)]

It is well-settled that federal courts are obligated to follow the choice of law rules of the state in which they sit. *Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Since this Court sits in Michigan, it must follow Michigan choice of law rules.[4]

■ In Michigan, the emphasis regarding choice of law in contract cases is upon the intent of the parties. *Liberty Mutual*

*Insurance Co. v. Vanderbush Sheet Metal Co.,* 512 F.Supp. 1159, 1169 (E.D.Mich. 1981). Consistent with the "intent of the parties" doctrine, Michigan law permits parties to choose for themselves which state's law will govern their contract. *See Liberty Mutual, supra,* 512 F.Supp. at 1169, and cases cited therein.

In this case, pursuant to the explicit provisions of the "Employee Agreement" signed by the parties, Plaintiff and Defendant have expressly agreed that Plaintiff's employment contract will be governed by and construed under *Texas* law. Thus, this Court will apply Texas law in deciding Plaintiff's breach of employment contract claim.

### 3. *Under Texas Law, Plaintiff Did Not Have a Just Cause Employment Contract.*

■ It is well-settled in Texas that employment contracts for indefinite term may be terminated at any time at will and without cause by either the employer or the employee. *East Line & R.R.R. Co. v. Scott,* 72 Tex. 70, 75, 10 S.W. 99, 102 (1888). The courts of Texas have steadfastly refused to vary that holding despite their recognition that the courts of 22 other states have carved out numerous exceptions to the at-will doctrine. In fact, it was only in 1985 that the Texas Supreme Court created its first (and only) judicial exception to at-will employment—what is known in Michigan as "the violation of public policy" exception—in *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985),[5] which the court itself was careful to emphasize was a "very narrow exception to

**4.** Since neither of the parties dealt with the choice of law issue in their respective briefs, at the November 8, 1990 hearing on the instant Motion, the Court asked the parties' counsel to address this issue. Counsel for EDS stated that EDS did not take the position that Texas law applies because in a recent Texas Supreme Court case, the Texas court ruled that the mere recitation of choice of law in a contract does not govern choice of law. However, as explained above, it is the law of the state in which the District Court sits that must be applied in determining the choice of law issue. Thus, for this Court, the choice of law question is governed by *Michigan* law. The Texas court's decision is, therefore, inapplicable, here.

As to Plaintiff's position on the choice of law question, Plaintiff's counsel told the Court on November 8th that Plaintiff did not raise the choice of law issue in her Response to Defendant's Motion because Texas substantive law on employment contracts is not favorable to her position.

**5.** The specific issue in the *Hauck* case was whether an allegation by an employee that he was discharged for refusing to perform an illegal act states a cause of action for wrongful discharge.

the employment-at-will doctrine" and that "[t]hat narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act."

■ Unless a plaintiff's case fits within the recently created public policy exception to at-will employment—which is not the case in this action—in order to succeed with a wrongful discharge/breach of employment contract claim under Texas law, a plaintiff who was employed for an indefinite term is required to show that he/she had an *express* oral or written agreement with his/her employer for termination of employment for cause only. *Vallone v. Agip Petroleum Co.*, 705 S.W.2d 757, 758 (Tex.Ct.App.1986); *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 336 (Tex.Ct.App. 1986).

Texas courts have *expressly* and repeatedly refused to allow claims of breach of employment contract where, as here, the allegation of a contract terminable for cause only is predicated on an alleged *implied* agreement for just cause termination based on the use of employee handbooks or policies and procedures manuals setting forth guidelines for termination, progressive disciplinary steps or grievance procedures. *See, e.g., Salazar v. Amigos Del Valle, Inc.*, 754 S.W.2d 410 (Tex.Ct.App. 1988) (trial court's grant of summary judgment in favor of the employer affirmed where the only agreement upon which plaintiffs predicated their allegation of breach of just cause employment contract was an implied agreement based on the use of a policies and procedures manual which provided for notice and grievance procedures before being discharged); *Vallone v. Agip Petroleum Co., supra* (employee handbook held not to create any contractual rights where plaintiff made no showing that termination policy set forth in the handbook was bargained for in a mutual agreement, and hence, trial court's grant of summary judgment was affirmed).

*See also, Reynolds Manufacturing Co. v. Mendoza*, 644 S.W.2d 536, 539 (Tex.Ct. App.1982) (holding that an employee handbook containing work rules, provisions regarding probationary status and attainment of seniority rights, and progressive disciplinary procedures when not accompanied by an *express agreement* dealing with procedures for discharge of employees did not establish a contract terminable for cause only):

Here, there is no evidence of any express agreement which dealt with procedures for discharge of employees, unless the employee handbooks can be read as such. We do not believe that the can be so read. *Reynolds was in no way prevented from unilaterally amending or even totally withdrawing its handbook. In fact, the original handbook was amended once during Mendoza's employment. We believe that the handbooks constituted no more than general guidelines. They were by no means comprehensive, nor were they intended to be implemented as the sole means to terminate contracts of employment.*

\* \* \* \* \* \*

We conclude that the verbal contract of employment between Reynolds and Mendoza was for an indefinite term of service; that the handbooks did not contractually limit the manner and procedure by which Reynolds could discharge any employee ... and that he is not entitled to recover any amount of money for loss of wages sustained by him as a result of his being discharged by Reynolds. Therefore, we hold that the employment contract between Reynolds and Mendoza was legally terminable at the will of either of them; that Reynolds had the lawful right to discharge Mendoza at any time, with or without cause; and that the loss of wages by mendoza which resulted as a consequence of his being fired is not a recoverable item of damages.

*Id.* [Emphasis added.]

In this case, Plaintiff signed an Employee Agreement before commencing her job which expressly provided that her employment at EDS was "termin[able] at will with or without cause by either party at any time". She further admits that no supervisor ever told her that her employment was

terminable for cause only. She also admits that she never signed any contract or agreement with EDS other than her original Employee Agreement which provided for at-will termination. Like the plaintiffs in *Salazar, Vallone* and *Reynolds*, Plaintiff here relies not upon any alleged *express* contract for just cause termination, but rather only upon an alleged *implied* just cause contract based on statements of alleged employment policy contained in an employee handbook and a supervisor's manual, and the oral representations made by one of her supervisors nearly 10 months after Plaintiff was fired regarding his personal understanding of EDS operations. As is evident from the foregoing discussion, such a claim is not legally cognizable under Texas law. Therefore, Defendant is entitled to summary judgment on Count I of Plaintiff's Complaint.

4. *Even Under Michigan Law, Plaintiff's Breach of Contract Claim Cannot Withstand Summary Judgment.*

█ In Michigan, a provision requiring cause for the discharge of an indefinite term employee "may become part of the contract, either [as in Texas] by express agreement, oral or written, *or* as a result of an employee's legitimate expectation grounded in an employer's policy statements." *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 598, 292 N.W.2d 880 (1980) (emphasis added). The *Toussaint* court, however, explained that its rule in that case did not do away with at-will employment:

> Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause. We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract.

*Id.* at 610, 292 N.W.2d 880. The court amplified this condition as follows:

> If Blue Cross or Masco had desired, they could have established a company policy of requiring prospective employees to acknowledge that they served at the will or the pleasure of the company and, thus,

have avoided the misunderstandings that generated this litigation.

*Id.* at 612, 292 N.W.2d 880. The court further noted:

> Where the employer has not agreed to job security, it can protect itself by entering into a written contract which explicitly provides that the employee serves at the pleasure or at the will of the employer or as long as his services are satisfactory to the employer.

*Id.* at 612, n. 24, 292 N.W.2d 880.

Consistent with the above-quoted Michigan Supreme Court's instructions, ever since the 1980 *Toussaint* decision, both Michigan state and federal courts, *and* the Sixth Circuit, have repeatedly held that employees cannot have "legitimate expectations" of continued employment—and, thus, no breach of implied just cause contract claim can survive—when the employee and employer have entered into an employment agreement which expressly provides that the employee's employment is terminable at-will, with or without cause, particularly, where, as here, the parties further expressly have agreed that the employee's at will status may only be modified by a writing signed by particularly identified company officials.

For example, the Sixth Circuit affirmed the grant of summary judgment as to the separate claims of breach of employment contract of three former Sears, Roebuck employees in *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453 (6th Cir.1986), where, before being hired by Sears, each of the plaintiffs had signed an application for employment that provided:

> In consideration of my employment, I agree to conform to the rules and regulations of Sears, Roebuck and Co., and my employment and compensation *can be terminated with or without cause, and with or without notice, at any time at the option of either the Company or myself. I understand that no store manager or representative of Sears, Roebuck and Co., other than the president or vice president of the Company, has the authority to enter into any agreement for employment for any*

*specified period of time, or to make any agreement contrary to the foregoing.* *Id.* at 456. [Emphasis added.]

In light of the above-quoted disclaimer, the *Reid* court held, "Though *Toussaint* holds that there may be an implied contract that employment may be terminated only for good cause, it does not hold that this may be the case where an express contract makes the term of employment at will." *Id.* at 462.

The *Reid* rule has been reaffirmed and reiterated numerous times since 1986, most recently in three recent 1990 Sixth Circuit cases, *Elsey v. Burger King Corporation*, 917 F.2d 256 (6th Cir.1990), *Duncan v. Rolm Mil–Spec Computers*, 917 F.2d 261 (6th Cir.1990), and *Vollrath v. Georgia Pacific Corp.*, 899 F.2d 533 (6th Cir.1990). The *Elsey* opinion is particularly noteworthy because in that case the Sixth Circuit carefully analyzed the plaintiff's allegations and the employer's *Reid* defense in light of the Michigan Supreme Court's recent decisions in *In re Certified Question (Bankey v. Storer Broadcasting Co.)*, 432 Mich. 438, 443 N.W.2d 112 (1989), and *Bullock v. Automobile Club of Michigan*, 432 Mich. 472, 444 N.W.2d 114 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1118, 107 L.Ed.2d 1024 (1990), and concluded that these two cases do not alter the *Reid* at-will disclaimer rule.

In *Elsey*, the plaintiff relied upon policy manual terms and oral promises in an attempt to avoid the general rule of at-will employment. As to policy manual terms, the plaintiff relied upon the first page of the Burger King Human Resources Policy Manual on Termination and Resignation, which manual plaintiff discovered *after* his discharge. The first page of the manual stated as follows:

Job Security is an important benefit which a company can provide its employees, and the building of this security is a major concern of the Company....

*Elsey v. Burger King*, at 258.

However, the sentence immediately following the above-quoted introductory sentence stated:

On the other hand, each individual must earn this security by his contribution, in whatever degree and manner his opportunities provide, to the success of the Company.

*Id.*

Most importantly, one of the policies and procedures set forth in the manual expressly dictated that Burger King employees served in an at-will capacity:

Employees and employer have the right to terminate employment at any time for any circumstance, and for any reasons that are attributed by the employer or employee.

*Id.*

The *Elsey* court concluded that because the policy manual at issue unequivocally established that the plaintiff's employment was at-will, the plaintiff could not avoid summary judgment by claiming that the "job security" sentence in the manual created an "instinct with an obligation" under *In re Certified Question, supra*, 432 Mich. at 454, 443 N.W.2d 112, or by relying on an argument that first and second sentences of the policy manual constituted conflicting policy manual statements that required jury consideration under *Dalton v. Herbruck Egg Sales Corp.*, 164 Mich.App. 543, 417 N.W.2d 496 (1987).[6]

---

6. The *Elsey* court further noted,

The plaintiff's policy manual claim is further undermined by his concession that he was unaware of the Burger King policy manual until after his discharge. The rationale for policy manual claims is that employers who promulgate policies favorable to their employees "secure an orderly, cooperative and loyal workforce," *see Toussaint*, 408 Mich. at 613, 292 N.W.2d 880, and therefore should not be permitted to "reap the benefits of improved employee morale without shouldering the burden of abiding by the policy manual terms that engender the improved morale." *Shivers*, 719 F.Supp. at 602. Here, *Elsey* cannot argue that Burger King furnished him with a policy manual in order to enhance his productivity by providing him with a false sense of security. Accordingly, the district court was correct in holding that Burger King should not be liable for a claim based upon a policy manual that had no impact whatsoever on the plaintiff's commitment to his job.

*Elsey, supra*, at 260.

This discussion of the plaintiff's "after-the-fact" discovery of alleged company policy is

Similarly in *Duncan v. Rolm, supra,* and *Vollrath v. Georgia Pacific Corp., supra,* the Sixth Circuit held that the explicit at-will provisions in Rolm's employment application and in Georgia–Pacific's Operating Policy Manual undermined the plaintiffs' allegations of just cause employment predicated on statements allegedly later made by their supervisors. *See also, Pratt v. Brown Machine Co.,* 855 F.2d 1225, 1235 (6th Cir.1988) (holding that explicit at-will language in the employee handbook served "to negate the legitimacy of any expectation [the employee] may have had based on [his manager's] representations").[7]

Based upon the foregoing discussion, it is clear that in this case, Plaintiff's claim that she had a just cause employment contract, even when construed under Michigan law, is without merit and, therefore, even under Michigan law, Defendant is entitled to summary judgment on Count I of Plaintiff's Complaint.

## C. *Plaintiff's Claims of Race Discrimination*

■ It is well-established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Carden v. General Motors,* 156 Mich.App. 202, 210, 401 N.W.2d 273 (1986), *lv. den.,* 428 Mich. 891 (1987). Under Michigan's Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.,* an employment discrimination plaintiff can establish his *prima facie* case by proving either (1) that he was accorded disparate treatment because of his race or (2) that his employer engaged in intentional discrimination. *Wyatt v. Southland Corporation,* 162 Mich.App. 372, 374–375, 412 N.W.2d 293 (1987); *Dixon v. W.W. Grainger, Inc.,* 168 Mich.App. 107, 114, 423 N.W.2d 580 (1987).

■ Plaintiff, here, has not alleged any discriminatory predisposition on the part of EDS supervisors who made the decision to fire her so as to make out a claim under an intentional discrimination theory, nor has she presented any facts from which to infer that she is alleging intentional discrimination.[8] Thus, the Court construes Plain-

---

applicable to this case inasmuch as in her Brief in Response to Defendant's Motion for Summary Judgment, Plaintiff Cox purports to rely not only upon the employee handbook she received shortly after beginning on the job, but also upon alleged policy statements she discovered—*after* filing this lawsuit—(1) in EDS's supervisors' manual, "Managing People", (which manual Defendant's counsel advised the Court at the November 8, 1990 hearing was not in effect in 1989), stating that EDS only fires people if they fail to perform their job duties or if they violate company policy, and (2) in the deposition testimony of Michael VanDyke that his understanding of EDS's operation was that EDS only fires people if they have a reason for doing so.

As to the Employee Handbook, the only language Plaintiff here relies upon in that document is a brief discussion regarding "performance appraisals" which includes the statement that "Successful performance in your present job is the major determinant of your future growth in EDS". There is nothing in the Employee Handbook which Plaintiff relies upon that even discusses termination at all, let alone termination "for cause only".

**7.** Other recent cases adhering to the *Reid* disclaimer rule include, *Taylor v. General Motors Corp.,* 826 F.2d 452, 457 (6th Cir.1987); *Dell v. Montgomery Ward and Co., Inc.,* 811 F.2d 970,

974 (6th Cir.1987); and *McCormick v. Sears, Roebuck and Co.,* 712 F.Supp. 1284 (W.D.Mich. 1989).

Plaintiff argued in her Response Brief, (at pp. 10–11), and at oral argument that, by application of *Bullock v. Automobile Club of Michigan, supra,* a jury submissible question is created in this case. This argument is misplaced. As explained by the Sixth Circuit in *Vollrath v. Georgia–Pacific, supra,* (in which case Plaintiff's counsel here, Donald Gasiorek, represented plaintiff Vollrath), *Bullock* applies where the plaintiff is relying on an *express* just cause employment contract and the defendant attempts to subsequently modify that express just cause employment contract by later issuing at-will policy statements. However, where, as here, the plaintiff had a express *at-will* contract and relies upon subsequently issued policy statements in an attempt to establish an expectation of discharge only for cause, *Bullock* does not apply. *Vollrath, supra,* 899 F.2d at 535.

**8.** Although not addressed at all in Plaintiff's *Response Brief,* at oral argument Plaintiff's counsel pointed to Plaintiff's personal journal [attached to Defendant's Brief as Ex. F] in which Plaintiff wrote that she felt that she was being "harrassed" by Diane Haas as purported

tiff's Elliot–Larsen claim as one of disparate treatment.

■ To make out a *prima facie* claim of disparate treatment, the plaintiff must produce evidence which at a minimum established that he was a member of a protected class and that for the same or similar conduct he was treated differently than similarly-situated non-minority employees. *Davis v. Monsanto Chemical Co.*, 858 F.2d 345 (6th Cir.1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989); *Long v. Ford Motor Co.*, 496 F.2d 500 (6th Cir.1974); *Dixon v. W.W. Grainger, supra.*

It is fundamental that to make a comparison a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated *in all respects. Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir.1988). Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment *must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mazzella v. RCA Global Communications*, 642 F.Supp. 1531 (S.D.N.Y.1986); *Lanear v. Safeway Grocery*, 843 F.2d 298 (8th Cir. 1988) (plaintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts were of comparable seriousness to his

own). Plaintiff's deposition testimony establishes that Plaintiff is unable to meet this burden.

■ Plaintiff claims that EDS discriminated against her on the basis of her race while she was still in EDS's employ by allegedly refusing her January or February 1989 request for a transfer to a different EDS division or facility. Although Plaintiff admitted that she knew she like all other EDS employees was not entitled to consideration for transfer unless she demonstrated a "solid meets" performance in her Troy, Michigan systems engineer position, she claims that "two other white females had received transfers ... upon demand." [Plaintiff's Deposition, p. 122.] However, when asked to identify these two alleged "comparables" she could only identify one of them.[9]

Moreover, as to the one white employee that Plaintiff did identify at her deposition—a woman named Emma Zook—Plaintiff's testimony regarding Ms. Zook demonstrates that she has no facts to establish the comparability of Ms. Zook's alleged treatment. Plaintiff admits that she knows nothing about Ms. Zook's request for transfer other than it occurred after Plaintiff allegedly asked Mike VanDyke about transferring, herself. She further admits that she and Ms. Zook did not work for the same supervisors. Nor does she know what Emma Zook's last evaluation (prior to her transfer) was or what performance rating Ms. Zook's supervisors gave her. [See Plaintiff's Deposition, pp. 123–125.][10]

evidence of intentional discrimination. However, as the Court noted on the record at the November 8, 1990 hearing, Plaintiff's subjective belief that she was being "harrassed"—particularly since no where in her journal does she allege that such harassment was *racially* motivated—is insufficient to establish a claim of intentional discrimination.

9. As to the alleged white comparable that Plaintiff could not identify, Plaintiff could not even offer a physical description of her, nor could she even say what her approximate age was, although she claimed that this unidentifiable individual was a "close" friend.

According to Defendant, this other alleged comparable whom Plaintiff could not identify is a woman named Jan Hoffpauir. [See para. 4 of

the Affidavit of Michael VanDyke, attached to Defendant's Brief as Ex. D.]

10. Plaintiff's failure to demonstrate that Emma Zook and Jan Hoffpauir were sufficiently "similarly situated" to make out a *prima facie* case of discrimination by comparing her treatment regarding her transfer request to the treatment afforded them is further established by the Affidavit of Michael VanDyke [Ex. D of Defendant's Brief in Support of its Motion for Summary Judgment], which Affidavit Plaintiff has not contradicted or disputed.

According to that Affidavit, both Ms. Zook and Ms. Hoffpauir had been employed in VanDyke's department in Troy for at least nearly two years (as opposed to Plaintiff's barely one to two month tenure at the time of her request for

Where a plaintiff cannot establish that employees whom he/she contends were treated differently were similarly situated in all respects, summary judgment is proper. *Gunner v. Chevron U.S.A., Inc.*, 684 F.Supp. 916 (E.D.Tex.1988); *Rials v. Allstate Insurance Co.*, 45 FEP Cases 33, 1987 WL 42406 (E.D.Mich.1987); *Sargent v. International Brotherhood of Teamsters*, 713 F.Supp. 999 (E.D.Mich.1989).

Since Plaintiff has no facts to establish that the two white employees she pointed to who received transfers were "similarly situated", no claim for discrimination can be based upon a comparison of their treatment.

As to Plaintiff's Complaint allegations of disparate treatment with regard to her discharge, just as with her failure to transfer allegations, Plaintiff has failed to present *any* evidence that similarly-situated white employees were not terminated for similar job performance deficiencies. In fact, Plaintiff's counsel admitted at the November 8, 1990 hearing that Plaintiff has no comparables with whom to compare her discharge. All that Plaintiff offers to support her claim of discriminatory discharge is (1) her purely subjective belief that she would not have been fired if she were white and (2) her denial and/or explanations of the incidents of unsatisfactory job performance, which incidents EDS points to as its "legitimate nondiscriminatory reasons" for Plaintiff's discharge.

First of all, conclusory allegations and subjective beliefs are insufficient evidence to establish a claim of discrimination as a matter of law. *O'Shea v. The Detroit News*, 887 F.2d 683 (6th Cir.1989); *Simpson v. Midland–Ross Corp.*, 823 F.2d 937 (6th Cir.1987); *Sisson v. Board of Re-*

*gents*, 174 Mich.App. 742, 436 N.W.2d 747 (1989), *lv. den.*, 434 Mich. 895 (1990).

With regard to Plaintiff's contention that her denial of EDS's reasons for firing her is sufficient to get to a jury, Plaintiff is mistaken. Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment. *Irvin v. Airco Carbide*, 837 F.2d 724 (6th Cir.1987); *Ridenour v. Lawson Co.*, 791 F.2d 52 (6th Cir.1986). The plaintiff bears the burden of establishing that the articulated reason is pretextual. *Wrenn v. Gould*, 808 F.2d 493 (6th Cir.1987).

In Plaintiff's Brief and at the November 8, 1990 hearing on the instant Motion, Plaintiff's counsel urged the Court to find that there is a genuine issue of material fact regarding EDS's negative assessment of her performance because Plaintiff disagrees with her supervisors' negative evaluations of her. Further, Plaintiff contends that this alleged material factual dispute regarding her own and EDS's assessment of her performance is sufficient to rebut EDS's "legitimate nondiscriminatory reason" for her discharge (her poor job performance) and thus, she argues that summary judgment should not be entered on Count II of her Complaint. In support of this argument, Plaintiff cited the Court to a 1987 Northern District of Illinois case which was affirmed by the Seventh Circuit in 1989 without published opinion, *Hights v. International Harvester Co.*, 675 F.Supp. 418 (N.D.Ill.1987), *aff'd* 873 F.2d 1443 (7th Cir.1989). The Court has reviewed this case and finds it quite persuasive, although not for the proposition which Plaintiff believes it stands for.[11]

transfer) and both Zook and Hoffpauir were "solid performers" with no job performance problems at the time of their request for transfer (unlike Plaintiff who was already experiencing performance problems at the time she expressed an interest in transferring). Moreover, Ms. Hoffpauir was a "hardship case" in that her husband had been transferred to Denver, Colorado and she would have had to leave the company unless EDS transferred her to its Colorado

facility. [See VanDyke Affidavit, paragraphs 2–4.]

11. At pp. 15–16 of her Brief, Plaintiff cites *Hights* for the proposition that when an employer points to a plaintiff's performance deficiencies as its "legitimate nondiscriminatory reason" for discharge, only a plaintiff's *actual* performance—not what her supervisors or co-workers believed it to be—should be considered. Thus, Plaintiff argues that when, as here, it is very

*Hights* was a Title VII and Section 1981 race discrimination action filed by a black secretary employed by Navistar International Transportation Corporation, (the successor-in-interest of the named defendant International Harvester Company), whose new employee probationary status was extended beyond her employer's normal 60-day probationary period. Admitting that she had no direct evidence of racial animus on the part of her supervisors, Hights attempted to make out a claim of race discrimination, like Plaintiff here, by relying on "indirect evidence" of discrimination. Her employer moved for summary judgment arguing that she had failed to make out a *prima facie* claim and that even if she had made out a *prima facie* claim, it had articulated a legitimate nondiscriminatory reason for extending her probation: her "uncooperative attitude" which the employer determined constituted "unsatisfactory performance" during the normal 60-day probationary period.

The court found that Hights had made out a *prima facie* claim, thus, it held that summary judgment on the basis of failing to state a *prima facie* case was not appropriate. Therefore, under *Burdine, supra,* the court proceeded to examine Navistar's proffered nondiscriminatory reason for extending the plaintiff's probation. 675 F.Supp. at 471. In that regard, the court determined:

> There is no question Navistar has advanced a legitimate nondiscriminatory reason for extending Hights' probation. Certainly the ability of a secretary to work cooperatively with fellow secretaries ... is a legitimate basis for employment decisions. [Citation omitted.] Hights does not contend such concerns are illegitimate. Indeed she recognizes their validity.

*Id.*

Thus, the court ruled, in accordance with *Burdine,* that the burden returned to Hights to raise a factual dispute as to whether the reason Navistar gave for its

decision was merely a pretext for discrimination. *Id.*

Hights purported "proof of pretext" was her own affidavit, in which she controverted, denied and set forth explanations and justifications for many of the incidents of "uncooperative" behavior (upon which her employer relied upon in determining that her probationary performance was unsatisfactory), and certain inconsistencies in the discovery record of Navistar's evidence of her on-the-job behavior and performance. However, like Plaintiff here, neither Hights' affidavit or any of the inconsistencies in the discovery record contained any allegation of race discrimination.

The court determined that Hights had established a factual issue as to whether she had behaved as alleged by her employer, but the court held that such a factual issue was not enough to withstand summary judgment on the plaintiff's race discrimination claim:

> As already noted, [the inconsistencies in the discovery record] coupled with [plaintiff's] affidavit denying many of the specific charges, are sufficient to establish a genuine issue of fact whether she actually behaved as alleged.
>
> *But that is not enough. It would not meet Hights' burden simply to generate a genuine dispute as to whether Navistar decided wrongly when it determined she was uncooperative. Nor would it suffice were she able to raise a genuine dispute as to whether Navistar's stated reasons are a pretext for some other reason. Rather the facts, with reasonable inference, must support a finding that the proffered reasons are a pretext for discrimination.* Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 559 (7th Cir.1987) (emphasis in the original), states the obvious:
>
> > Showing that the employer dissembled is not necessarily the same as showing *"pretext for discrimination."*
> >
> > \*   \*   \*   \*   \*   \*
> >
> > It would demand a truly extraordinary leap to infer from [the discrepancies

much disputed whether the plaintiff's performance was actually as described by the employer, summary judgment on claims of race discrimination claims should be precluded.

pointed out by plaintiff] that Navistar's proferred reasons for extending Hights' probation were a pretext for racial discrimination. *As [the Supreme Court's decision in Celotex v. Catrett] reminds us, this Court is to draw only reasonable pro-Hights inferences not every conceivable inference....* If supported with other consistent evidence, the inconsistencies might be stretched to suggest some personal animus [on the part of plaintiff's immediate superior]—*but what controls here is that they simply don't reasonably suggest racial bias.*

675 F.Supp. at 422. [Emphasis added.]

Plaintiff's arguments regarding a factual dispute concerning her performance in this case virtually mirror the arguments of the plaintiff in *Hights*, and having reviewed Plaintiff's deposition testimony in this case as well as her "journal" [Defendant's Summary Judgment Exhibit F], this Court finds—like the *Hights* court found in that case—nothing in the proffered evidence reasonably suggests racial animus on the part of EDS or any of Plaintiff's supervisors.[12] Plaintiff has simply presented no facts whatsoever from which reasonable jurors might infer race discrimination. As the court in *Hights* observed in granting the defendant's motion for summary judgment in that case:

> [W]hile Hights has made out the bare bones of a *prima facie* case of discrimination—just enough to shift the burden of production, though not of persuasion, to Navistar—Navistar has articulated a totally plausible nondiscriminatory rationale for its employment decision, and Hights has wholly failed to show any disputed material facts sufficient to warrant an inference that Navistar's rational was a pretext for race-based discrimination. Only someone who finds evidence of bias in every adverse (or even arguably adverse, though more likely neutral)

action that has affected someone who *happens* to be black—or Jewish, or female, or from Pakistan, or older—could perceive even a glimmer of such motivation in the record here. That may be Hights' subjective perception, but a court is duty-bound to take a less biased view. Summary judgment must therefore be granted to Navistar on both the Title VII and Section 1981 counts.

675 F.Supp. at 424. [Emphasis in original and footnotes omitted.]

This court perceives Plaintiff's claim of employment discrimination in this case in the very same light that the court in *Hights* viewed that plaintiff's claim. In essence, Plaintiff's claim is predicated on nothing more than the facts that (1) she is black and (2) she was fired. This is patently not enough to get to a jury. Accordingly, summary judgment will be entered on Count II of Plaintiff's Complaint.

### D. *Plaintiff's Claim of Discharge in Retaliation For Having Filed a Charge of Discrimination With the Michigan Department of Civil Rights*

In Count III of her Complaint, Plaintiff alleges that EDS fired her in May of 1989 because two months earlier she filed a charge of discrimination with the Michigan Department of Civil Rights regarding EDS's alleged failure to grant her January–February request for a transfer.

■ In order to establish a *prima facie* case of unlawful retaliation under Elliott–Larsen, a plaintiff must establish (1) that he opposed violations of the Act or participated in activities protected by the Act, and (2) *that the opposition or participation was a significant factor in an adverse employment decision. Booker v. Brown Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310 (6th Cir.1989); *Polk v. Yellow*

---

**12.** The Court is particularly unpersuaded by Plaintiff's counsel's arguments that racial animus should be inferred from Plaintiff's explanation/denial of EDS's version of the incidents of unsatisfactory performance because the EDS manager who was Diane Haas' and Michael VanDyke's superior—Curvie Burton—is black and Plaintiff admitted at her deposition that she never told Burton that she believed she was being discriminated against because of her race. Yet, she had felt comfortable enough to go to him to intercede for her when she was put on the Performance Improvement Plan in March 1989, and Burton had, in fact, interceded and overruled Haas and VanDyke in that instance.

*Freight System, Inc.*, 801 F.2d 190, 199 (6th Cir.1986). "The 'significant factor' standard requires a showing of more than a 'causal link'. A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge." *Polk v. Yellow Freight, supra,* 801 F.2d at 199; *Booker v. Brown–Williamson, supra,* 879 F.2d at 1310.

In considering whether a plaintiff has sufficiently stated a claim of retaliatory discharge for filing a civil rights charge to withstand summary judgment, it is proper for the court to employ the shifting burden analysis of *McDonnell Douglas–Burdine.* *Booker v. Brown–Williamson, supra,* 879 F.2d at 1311. Thus, the court must first consider whether the plaintiff has made out a *prima facie* claim of retaliatory discharge. If the plaintiff has made out a *prima facie* case, the defendant must articulate a legitimate, non-discriminatory reason for terminating the plaintiff's employment. Once a legitimate reason for the employer's actions is articulated, the plaintiff must prove pretext.

Applying the foregoing to the facts of this case, it is clear that Plaintiff's claim of retaliation cannot withstand summary judgment for several reasons. First, Plaintiff has produced insufficient evidence to establish that her March 1989 charge of discrimination was a "significant factor" in EDS's decision to terminate her employment. All that she alleges is that her discharge occurred after she filed a charge and that her supervisors knew about the charge. These allegations are virtually the same allegations relied upon by the plaintiff in *Booker v. Brown–Williamson, supra,* which both the trial court (Eastern District of Michigan District Judge Woods) and the Sixth Circuit found insufficient to establish a *prima facie* case. Moreover, just as the *Booker* court found in that case, assuming *arguendo* that Plaintiff has stated a *prima facie* case, Defendant has articulated a non-discriminatory reason for its termination decision and, as explained in Section III(C) of this Memorandum Opinion and Order, Plaintiff has not established

that the reason proffered by EDS is pretextual.

Moreover, just as in *Booker*, in this case, the lapse of time between Plaintiff's filing of the charge and her discharge (nearly two months), coupled with the fact that Plaintiff's documented performance problems occurred both before and after the filing of the charge weighs heavily against any finding of pretext in the absence of any direct evidence of racial discrimination. *See Booker, supra,* 879 F.2d at 1314.

Given these facts, the Court does not find that Plaintiff has established a jury submissible issue on her claim of retaliatory discharge. Thus, summary judgment will be entered on Count III of Plaintiff's Complaint.

### IV. CONCLUSION

For the reasons set forth above in this Memorandum Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that Plaintiff's Complaint be, and hereby is, DISMISSED in its entirety with prejudice.

Let Judgment be entered accordingly.